**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

BRADLEY J. KUHN,

               Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

               Defendant.

No. C05-3062-MWB

**REPORT AND RECOMMENDATION**

_____

## *TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

     A.    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     B.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
          1.    *Introductory facts and Kuhn's hearing testimony* . . . . . . . . . **3**
          2.    *Irene Blair's testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
          3.    *Kuhn's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
          4.    *Medical expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . **16**
          5.    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . **17**
          6.    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

III.    **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
       THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **20**

     A.    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **20**
     B.    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **23**

IV.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

V.     **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

# I. INTRODUCTION

The plaintiff Bradley J. Kuhn ("Kuhn") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Kuhn claims the ALJ erred in finding he could return to his past work, inappropriately weighing the medical evidence, and posing an improper hypothetical question to the Vocational Expert. (*See* Doc. Nos. 8 & 10)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On October 24, 2002, Kuhn protectively filed applications for DI and SSI benefits, alleging a disability onset date of October 11, 2002. (101-04, 388-93) Kuhn claims he is disabled due to bipolar disorder, which he states causes him to have conflicts with coworkers, difficulty coping, confusion, and difficulty concentrating. (R. 117) Kuhn's applications were denied initially and on reconsideration. (R. 87-92, 95-98, 394-403)

Kuhn requested a hearing (R. 99), and a hearing was held before ALJ Jean Ingrassia on April 13, 2005. (R. 38-86) Kuhn was represented at the hearing by attorney Blake Parker. Witnesses at the hearing included Kuhn; Irene Blair[1] from the Webster County Disability Alliance; Charlene Bell, Ed.D., who testified as a medical expert; and Carma Mitchell, a Vocational Expert ("VE").

On June 2, 2005, the ALJ ruled Kuhn was not entitled to benefits. (R. 16-27) Kuhn appealed the ALJ's ruling, and on July 25, 2005, the Appeals Council denied Kuhn's request for review (R. 9-12), making the ALJ's decision the final decision of the Commissioner.

---

[1]The transcript of hearing lists this witness as "Eileen Blair," rather than "Irene Blair." However, the ALJ, in his opinion, and the parties in their briefs refer to this individual as "Irene Blair."

Kuhn filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Kuhn's claim. Kuhn filed a brief supporting his claim on December 9, 2005. (Doc. No. 8) The Commissioner filed a responsive brief on February 3, 2006. (Doc. No. 9) Kuhn filed a reply brief on February 14, 2006. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Kuhn's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Kuhn's hearing testimony

Kuhn was born in 1964, making him forty-one years old at the time of the hearing. Kuhn acknowledged that he is not claiming he has any physical impairments at all; he is claiming disability solely on the basis of mental impairments. (R. 41)

Kuhn completed high school, and then took one year of vo-tech classes in welding and in HVAC (i.e., heating, ventilation, and air conditioning). He used his HVAC training minimally when he worked in maintenance at an apartment complex. He has never worked as a welder. (R. 41-42)

Most of Kuhn's past relevant work was as a carpenter, a carpenter's assistant, and a supervisory carpenter. At the time of the hearing, Kuhn was working as a peer support worker at Friendship Center, which Kuhn described as "[a] place where people go who have mental disabilities." (R. 42) Kuhn stated it was very difficult for him to feel comfortable at Friendship Center, but he gradually started going there more frequently at the urging of his doctor. (R. 56) As a peer support worker at Friendship Center, Kuhn helps keep the center clean by emptying the trash, doing dishes, picking up cigarette butts,

and the like. He helps new members get involved in activities and acts as a sounding board when they want to talk about their problems. Kuhn works seventeen or eighteen hours a week, on average, and he is paid $6.15 per hour. At the time of the hearing, he had been working at Friendship Center for about two years. (R. 42-43, 45)

According to Kuhn, the Friendship Center is supervised by the "County CPC office," which he stated is "where people in Webster County go if they need some help." (R. 43) He stated his supervisors on the job are social workers who work with people who have mental disabilities. They got him the job and are supportive of his needs. When he is unable to go to work, they find someone else to do the job that day. Kuhn stated this is not the type of job from which he could be discharged. He indicated if he were not working at Friendship Center, his only other alternative would be to stay at home, or to go to Friendship Center "just as a friend." (R. 44)

Kuhn lives in a one-bedroom house in Fort Dodge, Iowa. He receives HUD assistance to help him with his rent, and he also receives food stamps. Together with his earnings from Friendship House, these are his only sources of income. Besides going to Friendship House and doing grocery shopping as needed, Kuhn rarely leaves his home. He indicated it is difficult for him to go out in public, or to be around people or be in crowds. He has anxiety attacks, get scared and nervous, his heart will race, and he has trouble focusing. He stated he often has to miss work due to his nerves. (R. 45-46)

Kuhn stated he works at Friendship House three to five hours per day, and the work leaves him extremely fatigued. He likes doing paperwork at Friendship House because then he does not have to deal with people. When he gets home from work, he takes a nap. He is able to do his laundry and dishes and keep track of his medications, but he has problems managing money. He stated Easter Seals personnel were assisting him in creating a budget to keep his bills paid on time, and setting up a schedule to do his laundry, dishes, vacuuming, and other household chores. Kuhn also receives assistance

from Webster County Disability Alliance.  He indicated Irene Blair, who was present at the hearing, had assisted him throughout the process of applying for disability benefits. (R. 46-48)

At the time of the hearing, Kuhn was taking Klonopin (an anti-seizure medication) and Effexor (an antidepressant medication), both prescribed by Lee K. Berryhill, M.D., Kuhn's psychiatrist at North Central Iowa Mental Health Center.  Kuhn stated he was hospitalized in 2002.  After his release from the hospital, he went to Clarinda Treatment Complex for psychiatric treatment.  He returned to Fort Dodge, attempted suicide, and was hospitalized again.  He has been seeing Dr. Berryhill since that time and  he has been doing somewhat better.  (R. 49-50)

Kuhn stated his first "breakdown" was about six years ago.  He explained he "just fell apart, couldn't go to work, [and] hid in [his] basement for a week."  (R. 50)  While he was in his basement, he cleaned his washing machine with a toothbrush, painted the walls, and did what he termed as "just some bizarre things."  (*Id.*)  His family attempted to have him committed, and he ran away to Oklahoma.  He was hospitalized for a few days in Oklahoma, and then attended an outpatient therapy program for about six months, under the supervision of a doctor and a psychiatrist.  (R. 50-51)

Kuhn explained that when he is in the manic phase of his disease, he does not sleep much.  He is always up and moving and doing things.  He becomes obsessive about doing things perfectly, repeating tasks over and over again in an attempt to perform them perfectly, although they may have been quite satisfactory the first time.  Kuhn also suffers from ongoing depression, which he stated has been the case since his last manic phase in 2002.  (R. 51-52)

Kuhn stated he sometimes has problems getting along with people, and as a result, he tries to avoid talking to people.  He and his wife are separated, and he has difficulty maintaining long-term relationships with anyone.  He rarely speaks to his grandchildren.

When he thinks about going to visit people, he becomes anxious and nervous, and is preoccupied with thoughts of what they think of him and what they will say to him. (R. 52-53) He does not believe he could return to his past work as a finish carpenter because all of his jobs have required him to interact with coworkers, bosses, and the people for whom the jobs are being done. He stated if he could "go into an empty room and do [the] job, that would be wonderful but that never is how it seems to work." (R. 57) According to Kuhn, he was very good at his carpentry work, but he would have to take two or three weeks off every few weeks to cope with the work. He had problems dealing with the job on a day-to-day basis. (*Id.*)

Kuhn stated he "dabbled" with alcohol and marijuana, but he has had no substance abuse problems since about October 2002. He stated that in approximately March 2005, he talked to his doctor about reducing the number of medications he was taking, and his doctor took him off of everything except Klonopin and Effexor. (R. 54-55)

## 2.    *Irene Blair's testimony*

Irene Blair is the coordination administrator at Webster County Disability Alliance, which runs the Friendship Center. Blair has a B.A. degree in Education. She has taken several psychology and mental health classes in the course of her work, but none for college credit. She handles the mental health budget for Webster County, and is in daily contact with the people who attend the Friendship Center. She stated she listens to them when they need to talk, and if they need to see a psychiatrist, she refers them for therapy. However, she is not a counselor; she is a program administrator. (R. 60-61)

In Blair's opinion, Kuhn could not work at Friendship Center without the assistance of the social workers who coordinate his job. She stated all of the people who work at Friendship Center have mental illnesses, and the staff is very accommodating to them. For example, if Kuhn calls in and says he cannot work, they simply find someone else. It does

not matter how long someone stays off work, they can still return when they are able.  In Blair's opinion, without the ability to come and go when he pleases, Kuhn would stop coming at all and just stay at home all of the time.  She stated Kuhn's job at Friendship Center is part of his ongoing therapy process.  On days when he is not doing well, he can just do paperwork, rather than interacting with people.  (R. 58-59, 61)

### 3.    *Kuhn's medical history*

The record indicates Kuhn moved to Oklahoma in 2000 or 2001, after he was admitted into the hospital for bipolar disorder and doctors suggested he undergo electroconvulsive therapy.  Notes indicate he had been hospitalized about six years previously.  Kuhn and his wife moved back to Fort Dodge on May 2001, after Kuhn's stepson had children, so they could be near their grandchildren.  Kuhn saw a doctor at Trimark Physicians Group to get back on medication for his bipolar disorder.  The doctor noted Kuhn's judgment was good, his insight was limited but improving, and his thought content was logical and organized.  Kuhn completed a mental status examination that was normal with good orientation and memory.  He reported having some sleep difficulties, but not being truly manic.  Doctors prescribed a trial of Prozac, with a plan to consider Depakote if the Prozac was ineffective.  (R. 179-80)

The next record evidence of Kuhn's mental health treatment is when he saw a doctor requesting a review of his medication on October 15, 2002.  He stated he had been on Prozac for a year, but he recently was experiencing decreased energy and libido, increased irritability and anxiety, difficulty concentrating, and depressed mood.  The doctor noted Kuhn's affect was flat.  He increased Kuhn's Prozac dosage to 40 mg and added Valium 5 mg twice daily.  (R. 174)

On October 24, 2004, a "very tearful" Kuhn called North Central Iowa Mental Health Center ("NCIMHC").  He reported that he had a history of bipolar disorder, and

his doctor recently had increased his Prozac dosage and prescribed Valium. A couple of days after he began taking the higher dosage of Prozac and the Valium, he began feeling "manic," with "unlimited energy and trouble sleeping," although his mood remained depressed. He had dropped his Prozac dosage back to 20 mg and had been taking additional Valium. Kuhn reported his manic episodes generally lasted one to two weeks, during which he had a lot of energy, worked hard, and over-spent his money. During his depressive episodes, which would last much longer, he would feel down, irritable, angry, and have little tolerance for others. He reported current symptoms of a manic episode, and stated he had been staying down in his basement doing laundry for two weeks. He stated he thought of suicide constantly, and he had gone out to the country the previous evening, taking a gun with him. He also was having some thoughts of hurting his wife. He stated he had been on a leave of absence from work for two weeks, hoping his mood would improve so he could return to work. Instead, his mood had worsened, and he stated he could not "see being able to work in his current condition." (R. 182-83)

Kuhn met with Lee K. Berryhill, M.D., who recommended immediate inpatient treatment. Kuhn was admitted to Trinity Regional Medical Center, and was started on Risperdal, Prozac, and Depakote. In addition, Kuhn experienced an anxiety episode during admission, and he was started on Librium. His GAF upon admission was assessed at 25, indicating serious symptoms. On October 29, 2002, Kuhn was transferred to Clarinda Mental Health Institute, a state facility, because of his concerns about his finances. At the time of discharge from Trinity, Kuhn was still depressed and pessimistic about the future, although he had no current plans to harm himself. His medications on discharge were Risperdal 2 mg twice daily; Cogentin 1 mg daily; Depakote 500 mg twice daily; and Prozac 20 mg daily. (R. 185; *see* R. 185-93)

Kuhn was treated at the Clarinda facility from October 29, 2002, through November 12, 2002. His discharge diagnoses were Major Depressive Disorder,

Recurrent, Severe, without Psychotic Symptoms; History of Bipolar Disorder; and Poly Substance Abuse vs. Dependence. (R. 206) His prognosis was Guarded. His discharge medications were Prozac 20 mg daily and Depakote 500 mg daily. He was scheduled for follow-up through NCIMHC. (R. 203-07; *see* R. 208-14)

On November 14, 2002, Kuhn was seen by a social worker at NCIMHC on an emergency basis after he called to report he was feeling quite depressed. According to Kuhn, he was taking his medications as prescribed, and he stated he did not believe substance abuse was an issue for him at this time. He was advised to return for individual counseling to address personal issues. (R. 225-28)

On November 18, 2002, Kuhn again was hospitalized at Trinity Regional Medical Center after he overdosed on a combination of drugs. Kuhn reported he had contemplated shooting himself but instead had decided to take a drug overdose. Apparently, Kuhn's wife had stated she was leaving him, which precipitated his actions. Kuhn was hospitalized for treatment until December 6, 2002, when he was discharged without suicidal or homicidal ideation. He was referred to see Dr. Berryhill for follow-up and ongoing treatment. His discharge medications were Zoloft 100 mg daily, Lithium 300 mg three times daily, and Lorazepam .5 mg daily as needed for anxiety. (R. 194-202)

During Kuhn's hospitalization, his wife called Dr. Berryhill and staff at NCIMHC several times to report her fears that Kuhn would harm her upon his release. (*See* R. 221-23) She asked to be notified in advance of his release. She stated she and other family members were afraid of Kuhn, whom she described as "a violent man," and that was why they would not file a legal action to commit him. A social worker from NCIMHC interviewed Kuhn's mother, who stated Kuhn had had problems ever since his adoptive father died earlier in the year. She also stated Kuhn had "learned about getting disability when in Clarinda and he [was] 'playing the system.'" (R. 221) Kuhn's sister met with doctors during Kuhn's hospitalization, and asked about discharge options. Doctors

recommended Kuhn live in supportive housing, and the hospital social worker contacted a state agency about funding. A case manager was assigned to assist Kuhn. (R. 220) Kuhn went on a weekend pass with his sister and brother-in-law, without any problems.

On December 6, 2002, Kuhn was approved for housing assistance and was accepted into an apartment at "Wahkonsa." He was scheduled for follow-up with Dr. Berryhill on December 12, 2002, and for individual therapy on December 11, 2002. Kuhn "was encouraged to begin looking for work." (R. 215) Notes indicate Kuhn "had mentioned his hope of getting social security but Dr. Okoli informed him he did not believe [Kuhn] would be considered disabled." (*Id.*)

Kuhn began attending twice-weekly outpatient treatment sessions on December 11, 2002. He separated from his wife, and reported that his two sisters were helping him with some money and food. (R. 259) He continued to report some anxiety, and on December 12, 2002, Dr. Berryhill noted Kuhn "made occasional nervous movements with hands and feet." (R. 267) Dr. Berryhill continued to monitor Kuhn's medications, making changes as necessary. (*See, e.g.*, R. 264-67) During December and January, Kuhn was taking Lithium, Zoloft, and Ativan. A routine staff evaluation of Kuhn's progress on January 11, 2003, indicated his prognosis was "fair." Staff at NCIMHC noted Kuhn had "demonstrated tendencies not to follow up with psychiatric services or follow treatment recommendations made to him." (R. 264) At this review, Kuhn's counselor indicated Kuhn's therapy services could be expected to last one year. (R. 265)

On January 21, 2003, John F. Tedesco, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 232-45), and a Mental Residual Functional Capacity Assessment form (R. 246-49, 250). He noted Kuhn's activities of daily living suggested he was relatively low-functioning. Kuhn had quit his job, but his employer indicated he would rehire him. Dr. Tedesco noted Kuhn's long-standing diagnosis of Bipolar Disorder had not prevented him from working at substantial gainful activity levels

in the past. He found Kuhn's "recent hospitalization was precipitated by situational variables, most notably domestic conflict," and he also found it was not clear as to the extent alcohol dependence may or may not have been material in Kuhn's suicide attempt. He found it reasonable to conclude that Kuhn would return to his baseline level of functioning by October 2003, as long as he continued to comply with treatment recommendations and abstain from alcohol. Dr. Tedesco further noted none of Kuhn's treating sources had provided an opinion regarding Kuhn's work-related functioning. (R. 250)

On January 30, 2003, Kuhn saw Dr. Berryhill for follow-up. Kuhn reported he was sleeping only four or five hours per night. Dr. Berryhill noted Kuhn's bipolar disorder was "fairly well controlled with medication." He further noted that if Kuhn was "turned down by Social Security," the doctor would "state an opinion that he does suffer from Bipolar Disorder and that this contributes to his poor work record." (R. 263)

It appears Kuhn began working as a peer counselor at Friendship House in February 2003. (*See* R. 262) During February and March 2003, he continued to complain of some anxiety and sleep problems, but doctors noted he was working hard at making progress, and his Bipolar disorder was improving slowly. (R. 261, 262)

Kuhn saw Rasiklal Patel, M.D. at NCIMHC on April 17, 2003. He was making some progress in his emotional health, and he was sleeping better on Klonopin. He reported having less anxiety and feelings of panic. (R. 297)

On May 9, 2003, Dee Wright, Ph.D. completed a Psychiatric Review Technique form (R. 268-81, 286), and a Mental Residual Functional Capacity Assessment form (R. 282-85) Dr. Wright noted Kuhn had been diagnosed with mental impairments of bipolar affective disorder and an alcohol dependence disorder. As of January 2003, his treatment goal was stabilizing his condition such that he could return to work within twelve months. Updated records from NCIMHC indicated Kuhn's bipolar disorder was improving

slowly and his condition was beginning to stabilize. Dr. Wright found that if Kuhn continued to be compliant with his treatment recommendations, it would be "reasonable to assume" Kuhn's condition would improve to the point that he could return to work by October 2003, within twelve months of his alleged disability onset date. Dr. Wright found Kuhn's allegations that his condition was worsening not to be supported by the medical evidence of record submitted by Kuhn's treating psychiatrist as NCIMHC. (R. 286)

Kuhn saw Dr. Berryhill for follow-up on May 16, 2003. He reported feeling "pretty good in spite of some practical problems," including being unemployed and having very little money. He and his estranged wife were talking occasionally. Kuhn stated he was calm most of the time. He had occasional panic attacks, for which he was taking Ativan. The doctor noted Kuhn appeared to be "in a fairly good mood but not excessively high." (R. 296)

From June through October 2003, Kuhn continued to see doctors at NCIMHC on a monthly basis for medication follow-ups. (*See* R. 288-96) Zoloft was added to his medication regimen on July 2, 2003. At that time, Dr. Berryhill noted that although Kuhn complained of anxiety, "he doesn't seem to be bad off." (R. 294) In August 2003, Kuhn stated he felt anxious and had thoughts of cutting himself, but instead he had gotten body piercings and tattoos. He planned to stop going to the Friendship Center as a drop-in because clients who saw him as a peer counselor would press him to listen to their problems. Dr. Berryhill added Luvox to Kuhn's medications to combat his obsessive-compulsive ideas of cutting himself. (R. 292) The Luvox was discontinued the next month because Dr. Berryhill felt it had not helped Kuhn, who had burned himself intentionally. (R. 291) In October 2003, Kuhn obtained two refills of Lorazepam. When he saw a doctor, he stated the multiple refills were "not his fault," and were the result of a paperwork error at the County. He stated he was not abusing his medications, and he promised to bring in his prescription bottles so the doctor could count his pills. (R. 288)

On October 25, 2003, Kuhn was admitted to the hospital with complaints of feeling depressed, and having violent thoughts directed towards himself and his wife. S.O. Lee, M.D. noted Kuhn evidenced "elements of manipulation or wanting to control his medications, especially benzodiazepine." (R. 316) He planned to continue Kuhn on his current medications. On October 27, 2003, Kuhn stated he was not having racing thoughts or violent feelings any longer, and he wanted to go home. He was discharged on Lithium, Klonopin, Ativan, and Wellbutrin. He was directed to follow-up at NCIMHC. (R. 313; *see* R. 312-61)

Kuhn apparently had lithium levels run at the hospital every few months through May 2004. (*See* 362-77) Otherwise, there are no further treatment notes or other evidence in the record from Kuhn's treating sources.

On November 15 and 19, 2004, David P. Johnson Ph.D. saw Kuhn for a mental status examination at the request of Disability Determination Services. (R. 299-310) In a report dated December 3, 2004, Dr. Johnson noted Kuhn had stated he was feeling "okay" now that his medications had been regulated. He had been sleeping reasonably well, but also took naps during the day. He reported a low energy level overall, but with spurts of energy; difficulties with concentration and memory; mild obsessive-compulsive tendencies; and decreased interest and pleasure in his usual activities. He acknowledged that he used to drink heavily about two years earlier, but stated he used alcohol only rarely at this time. He acknowledged occasional marijuana use. He stated he was using his medications as prescribed, and he denied having any manic episodes since his 2002 hospitalization. (R. 2299-301)

Kuhn completed an MMPI-2 test, but Dr. Johnson found the results of the test to be invalid. He was unable to determine whether the skewed results were from intentional efforts by Kuhn to make himself appear as troubled and distressed as possible, or from "a sense of confusion and disorientation resulting from his emotional disturbance." (R. 303)

Dr. Johnson called Kuhn a few days later, explained the problem, and asked Kuhn to retake the test. Kuhn was anxious that he would be regarded as "faking," but he agreed to repeat the test. However, the results were the same, and the clinical profile again was invalid. In Dr. Johnson's judgment, the skewed results were the result of Kuhn's level of emotional distress and anxiety, causing Kuhn to exaggerate the severity of his problems unintentionally due to a fear of having his problems not be understood or accepted. (R. 303-04)

With regard to Kuhn's work-related functional capacity, Dr. Johnson reached the following conclusions:

> [Kuhn] would appear able to remember and to understand simple instructions, procedures, and locations. He would appear to be mildly to moderately limited in his ability to remember and to understand more detailed or complex instructions, procedures, and locations, and in his ability to maintain attention, concentration, and pace on the job. He would appear to be moderately to severely limited in his ability to carry out instructions, to interact appropriately with supervisors, coworkers, and the public, and in his ability to use good judgment and to respond appropriately to changes in the work place.
>
> He appears able to manage financial benefits on his own behalf if such benefits are provided to him

(R. 305) Dr. Johnson assessed Kuhn's current GAF, and his highest GAF in the past year, at 45, indicating serious symptoms or serious impairment in social or occupational functioning. *See* DSM-IV at 32 (4th ed. 1994)

Dr. Johnson completed a form to indicate Kuhn's ability to do specific work-related activities (R. 307-10). He indicated Kuhn would have only fair ability to perform the majority of work-related functions, and poor or no ability to deal with the stress of semi-skilled or skilled work; complete a normal workday and work week without interruptions from psychologically-based symptoms; and deal with normal work stresses. Dr. Johnson

recognized that Kuhn has some vocational skills, but in his judgment, he found it unlikely that Kuhn could "sustain emotional functioning and interpersonal behavior over time in a work setting that is normal [and] competitive." (R. 309) He opined Kuhn would be absent from work more than four days per month. (R. 310)

On April 11,2005, Nurse Practitioner Julie L. Schneider, from the office of Psychiatry, Lee & Associates, answered several interrogatories concerning Kuhn's condition. (R. 384-87) Schneider indicated Kuhn had been seeing a therapist "weekly to monthly" at the clinic since October 30, 2003. She listed Kuhn's current diagnoses as "Bipolar I Disorder Most Recent Episode Mixed, Severe, Without Psychotic Features"; "Social Anxiety Disorder"; and "Post-Traumatic Stress Disorder, Childhood Abuse." (R. 385) She listed Kuhn's initial GAF at 45, and his current GAF at 50 to 55, indicating moderate symptoms, for the most part (with 50 being at the highest end of the severe symptom range). Kuhn was taking Effexor XR and Klonopin. Schneider stated Kuhn had not had a manic episode for about two years, but he had had "several hypomanic episodes, severe anxiety, depression, anhedonia, and decreased energy." (R. 386)

Schneider stated Kuhn misses a day of his part-time work about every two weeks, he experiences a high degree of anxiety and difficulty with social situations, and he struggles with controlling his emotional response to anxiety-provoking situations. He follows a cycle of over-productivity followed by depression during which he sleeps a lot and stays in his apartment for several days. Schneider noted her opinion regarding Kuhn's ability to function is "based on face-to-face discussion during medication management appointments, and brief medication related consultations with his therapist[.]" (R. 387) She also noted Kuhn's position at Friendship Center "is a position for people with mental health disabilities, working with people with mental health and mental illness issues," and the job allows Kuhn to miss work when he feels unable to function. (*Id.*)

### 4. *Medical expert's testimony*

Charlene Bell, Ed.D. has a Bachelor's Degree in elementary education, a Master's Degree in guidance and counseling, and a Doctor of Educational Psychology from the University of South Dakota. (R. 62, 66) She has worked as an elementary school teacher; a school psychologist, providing clinical care; a professor at the university level; and supervisor of psychological services for disabled individuals. She has four or five individual clients per week and does consulting services the rest of the time. (R. 66-70)

Dr. Bell testified that she has never interviewed or met Kuhn. She reviewed the file, and listened to the testimony from Kuhn and Blair. She testified that in her opinion, Kuhn does not have a severe mental impairment that meets the Listing requirements. In her opinion, Kuhn has severe mental impairments of Obsessive Disorders and Substance Addiction Disorder. Although he has a diagnosis of Anxiety-Related Disorder, Dr. Bell opined this impairment is not severe because Kuhn is able to function at a moderate level in terms of his activities of daily living, social functioning, concentration, and persistence. She noted Kuhn is very responsible for some areas of his life, he gets along quite well with his peers, and he is a good listener, which requires concentration. (R. 62-63) She noted Kuhn's mood swings vary, and there are days when he is "right on" and days when he is not. (R. 64) In her opinion, an individual with the type of intermittent symptoms Kuhn has evidenced would be able to function in the workplace. (R. 65)

Dr. Bell reviewed the report from Dr. Johnson's consultative evaluation of Kuhn, and she found some of Dr. Johnson's conclusions to be "based upon an invalid interpretation." (R. 72-73) She testified she was unable to determine the basis for Dr. Johnson's conclusions based on his report that Kuhn's two MMPI tests were invalid. (R. 77-78) Dr. Bell acknowledged that her opinions differed from Dr. Johnson's regarding

Kuhn's ability to work, and she stated her frame of reference for her opinion was the fact that Kuhn was working sixteen or seventeen hours per week at Friendship Center. (R. 76-77)

### 5. Vocational expert's testimony

The ALJ asked VE Carma Mitchell to consider the following hypothetical question:

> [W]e have a 38-year-old individual who is currently 41-years-old, twelfth grade education plus some courses in welding, basically not alleging any physical impairments. He is alleging that he is disabled by virtue of a severe mental impairment. This individual has done skilled work in the past, as well as, semi-skilled work. His diagnoses with intermittent manifestation would appear to only mildly affect his ability to function independently, appropriately, and effectively in a competitive job market on a sustained basis. He has the ability to understand, carryout [sic], and remember non-complex instructions. He has the ability to use judgment. He has the ability to respond appropriately to supervisors, coworkers, and the public. He has the ability to deal with changes in a routine work setting. He received an exemplary evaluation from his last employer, the one prior to Friendship House. He was able to work successfully in the competitive job market in his area of specialty as a finish carpenter, as a maintenance person, and then on the evaluation that we have from a former employer is positive. He indicated that the Claimant voluntarily quit that position. He was not fired. He didn't indicate that he had any problems with coworkers, the public, or supervisors. So with the restrictions that we have outlined, will he be able to perform any of his past work activity?

(R. 79-80) The ALJ clarified that the individual's diagnoses "[w]ould only mildly affect his ability to function independently, appropriately and effectively and that interference would occur on those days that he has exacerbations of his condition." In addition, the individual could perform more than just unskilled work, but not highly skilled or technical work. (R. 80)

The VE stated the hypothetical individual could perform Kuhn's past work as a maintenance man, but the supervisory carpentry work would be more complex than allowed by the hypothetical's parameters. (*Id.*) The VE explained that based on the limitations set forth in the hypothetical, the carpentry job would be overly complex "to the extent where a person would have to be . . . following blueprints, taking measurements, estimating time, materials, quantities, working on schedule with other trades, coordinating the work that they were doing with others, and then working to their satisfaction as well." (R. 80-81)

The ALJ asked if the individual would "still be able to do maintenance work if he had a moderate limitation in his ability to maintain attention and concentration for an extended period of time but he had the ability to maintain attention and concentration for a short period of time and to carry out short and simple instructions during that time." (R. 81) The VE responded as follows:

> I think it depends on the type of maintenance work that you're talking about. Like the maintenance carpentry work, you know, I would say would be precluded because that was skilled and that would be more technical, more complex. I had added maintenance worker which was basically, you know, a janitorial type work when he was doing the building maintenance for the apartment and that type of thing. Yes, that I feel could possibly be done with the moderate limitation regarding attention and concentration for extended periods. Because I don't view those as being extended periods that a person would have to be concentrating. I mean, they would have to be able to attend and keep doing what they were doing and complete the task but it wouldn't require extended concentrations if I'm understanding.

(*Id.*)

The ALJ then asked whether, if the individual could maintain attention and concentration for short periods of time and carry out short and simple instructions, there would be other types of work he could perform. The VE responded that the individual's

acquired skills from his carpentry work would allow him to perform several different semi-skilled assembly jobs that would require the use of tools. The VE gave examples of a truss assembler; a hand nailer, such as assembling pallets; a door assembler; a wooden ware assembler; and a component assembler, such as assembling parts for wooden trailers. (R. 81-83) According to the VE, the individual also could perform unskilled, entry-level jobs such as laundry worker or salvager; light jobs such as poultry boner; and a wide range of unskilled jobs, including "[a]nything from cleaning, light cleaning jobs, clearing tables in a cafeteria, unskilled mail clerk job." (R. 82-84) She indicated all of these jobs exist in sufficient numbers in both the local and national economies. (*Id.*)

Kuhn's attorney asked the VE to consider an individual of Kuhn's age and with his educational background who is unable to complete a normal workday or work week without interruptions from psychologically-based symptoms; has no ability to deal with normal work stresses; and would have anticipated absences from work due to psychologically-based symptoms of four or more days per month. The VE indicated this individual would be unable to perform any competitive employment. (R. 84-85)

### 6. *The ALJ's decision*

The ALJ found Kuhn's job at Friendship Center does not constitute substantial gainful activity. She found Kuhn has severe impairments consisting of "bipolar disorder, alcohol dependence disorder in current remission, social anxiety disorder and post traumatic stress disorder secondary to childhood abuse." (R. 20) However, she found these impairments, singly or in combination, do not meet the Listing requirements.

The ALJ gave no weight to Dr. Johnson's opinion regarding Kuhn's ability to function in the workplace because, in the ALJ's view, Kuhn performed "many of the same types of activities that Dr. Johnson indicated would not be possible for [Kuhn] to perform" in the course of his part-time job at Friendship Center. (R. 23) For reasons not entirely

clear, the ALJ also found Irene Blair's testimony not to be fully credible. (R. 24) She found Kuhn's credibility to be "eroded" and his testimony not to be fully credible. (R. 24-25) Although she did not specifically so state, the ALJ apparently gave substantial weight to the opinion of Charlene Bell, Ed.D. (*See* R. 25)

The ALJ found Kuhn "retains the residual functional capacity to perform the mental and physical requirements of work with the following limitations: the claimant has no physical limitations. He is able to perform simple, routine, repetitive work, could use independent judgment, and is able to respond appropriately to co-workers, supervisors and the public." (*Id.*)

The ALJ found the hypothetical question posed to the VE by Kuhn's attorney did not accurately reflect Kuhn's residual functional capacity. She relied, instead, on the VE's responses to her own hypothetical question, which she found to be "consistent with the claimant's profile as to age, education, previous work experience and residual functional capacity." (R. 26) The ALJ found Kuhn could return to his past relevant work as a maintenance worker, and he also could perform other jobs that exist in significant numbers in the national economy, including truss assembler, hand nailer, door assembler, wooden ware assembler, component assembler, laundry worker, salvager, and poultry boner. She therefore found Kuhn is not disabled. (R. 27)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is

"not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving

Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have

weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;

| 2) | the duration, frequency and intensity of the pain; |
|---|---|
| 3) | precipitating and aggravating factors; |
| 4) | dosage, effectiveness and side effects of medication; |
| 5) | functional restrictions. |

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## *IV. ANALYSIS*

Kuhn argues the ALJ gave too much weight to the opinions of non-examining, consultative medical sources, including Dr. Bell who testified as a "medical expert," and failed to give appropriate weight to Kuhn's own care providers and to the examining source, Dr. Johnson. He also argues the ALJ failed to develop the record properly concerning his past relevant work. He notes the ALJ found Kuhn could return to his past job as a maintenance worker, but he argues there is no evidence of record that this work was performed at the substantial gainful activity level. He further notes this case is based solely on his mental functional limitations, and the ALJ "made no attempt to describe the mental demands of the past relevant job that [the ALJ] was asserting was available and to determine [Kuhn's] mental limitations affecting his residual functional capacity." (Doc. No. 8, p. 16) Kuhn also argues the hypothetical questions posed to the VE by the ALJ were improper because they did not accurately reflect his impairments and they were not based on substantial evidence. (*See* Doc. No. 8)

The Commissioner devotes the majority of her argument to the issue of whether the ALJ assessed Kuhn's credibility properly – an argument not raised by Kuhn in his brief. (*See* Doc. No. 9, *and compare with* Doc. No. 8) She argues Kuhn's assertion that he is unable to work is contradicted by a work performance assessment completed by Kolacia

Construction, where Kuhn worked from November 16, 2001, through October 10, 2002. She notes the evaluation was positive and the employer stated Kuhn would be rehired if he so requested. She further notes Kuhn terminated his employment; he was not fired. Kuhn argues this work evaluation is irrelevant because he worked for Kolacia prior to the time he alleges he became disabled. (*See* Doc. No. 10) He argues a more relevant work assessment is the one provided by Irene Blair, who is currently Kuhn's "boss" at Friendship Center. The court agrees. The fact that Kuhn's employer prior to his alleged disability onset date would have been willing to rehire him does not contradict Kuhn's claims regarding his current limitations. In addition, the record reflects that even while Kuhn was doing carpentry work, he sometimes took several days or even two weeks off from work due to psychologically-based symptoms, and when he was on the job, he sometimes became obsessive, repeating a task repeatedly even when it was not necessary to do so.

Because the court finds the evaluation of Kuhn's previous employer to have little relevance here, the ALJ's hypothetical question to the VE also was invalid. The ALJ asked the VE to consider someone who "was able to work successfully in the competitive job market in his area of specialty as a finish carpenter, . . . and then on the evaluation that we have from a former employer is positive," indicating Kuhn's work was satisfactory and he had no problems getting along with others. (R. 79) However, there is no evidence of record that Kuhn was able to work successfully in the competitive job market in any job after his October 2002 hospitalization, which coincides with his alleged disability onset date.

The Commissioner further argues none of Kuhn's treating physicians ever gave an opinion indicating Kuhn is unable to work. (*See* Doc. No. 9, p. 17) However, the court notes the Commissioner never requested a treating source statement regarding Kuhn's ability to work. The lack of notations in the treatment notes regarding work restrictions

cannot constitute substantial evidence in the record to support a finding that Kuhn is not disabled. *See Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). The court finds it significant that the consulting medical expert who did examine Kuhn, Dr. Johnson, expressed the opinion that Kuhn would be unable to function in a normal, competitive work environment. As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). In the present case, the record contains abundant evidence that Kuhn does not respond well to the ordinary stresses of working part-time, much less full time. In placing weight on the fact that Kuhn is able to work at Friendship House, the court finds the ALJ failed to give adequate consideration to the accommodations made for Kuhn in that job, and indeed the fact that the job itself has been created and designed to accommodate a personal with a mental disability.

For these reasons, the court finds the record does not contain substantial evidence to support the ALJ's conclusion that Kuhn is not disabled. Further, the court finds the record contains substantial evidence to support the opposite conclusion, that Kuhn is disabled and has been since October 11, 2002.

## V. CONCLUSION

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[2] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 22nd day of May, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[2]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).